2020 IL App (2d) 190372-U
No. 2-19-0372
Order filed December 22, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of DuPage County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 08-CF-1861 |
| GRANT W. GAMBAIANI, | ) ) ) | Honorable Brian F. Telander, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE HUTCHINSON delivered the judgment of the court.
Justices Jorgensen and Schostok concurred in the judgment.

**ORDER**

¶ 1     *Held*:  Defendant failed to demonstrate manifest error in the trial court's denial of his postconviction ineffective-assistance-of-counsel claim.

¶ 2     Following a third-stage evidentiary hearing, the trial court denied defendant Grant W. Gambaiani's request for postconviction relief on the grounds that his counsel was ineffective when advising him of the State's plea offer. We affirm.

¶ 3                                I. BACKGROUND

¶ 4     Following an outcry statement by 10-year-old D.G., and a criminal investigation, on July 29, 2008, a grand jury charged defendant (D.G.'s 24-year old cousin) with four counts of predatory

criminal sexual assault of a child (720 ILCS 5/12-14.1(a)(1) (West 2008)), one count aggravated criminal sexual abuse (720 ILCS 5/12-16(c)(1)(i) (West 2008)), and one count of child pornography (manufacture) (720 ILCS 5/11-20.1(a)(1)(vii) (West 2008)). All of the offenses involved defendant's sexual acts with D.G.

¶ 5    In July 2009, defendant received a plea offer whereby he would plead guilty to a single Class 1 non-probationable offense with a sentence of 4 to 15 years to be served with day-for-day credit; in exchange, the State would drop the remaining charges. Defendant discussed the offer with his attorneys, Kevin Halvorson and Elliot Samuels, and his father, John; then, defendant rejected the offer. During this time, the police had defendant's computer in their possession and, on September 10, 2009, the State charged defendant by information with 15 additional counts of possessing child pornography (depicted child is under 18 years old) (720 ILCS 5/11-20.1-(A)7 (West 2008)) and 3 counts of aggravated child pornography (possessing photographs of children under the age of 13 years (720 ILCS 5/11-20.3-(A)6 (West 2008)) for images found on defendant's computer.

¶ 6    The case proceeded to a first jury trial on May 5, 2010. Prior to trial, the State nol-prossed one of the child pornography (possession) charges. At trial, the evidence showed that defendant would show D.G. child pornography, that defendant had repeatedly sexually assaulted D.G. and that defendant possessed numerous images of child pornography. After trial, the jury found defendant guilty of each of the remaining charges, and the trial court sentenced defendant to an aggregate 43 years' imprisonment.

¶ 7    On appeal, Halvorson and Samuels continued to represent defendant. We reversed due to a discovery violation by the State, but also held that double jeopardy did not bar a retrial. See *People v. Gambaiani*, 2012 IL App (2d) 101246-U. On remand, the State offered defendant a 25-

year sentence, but defendant rejected that offer as well. Defendant then fired Halvorson and Samuels, and hired attorney Stephen Brundage. Following a retrial, defendant was convicted on all counts except for one of the predatory criminal sexual assault charges and sentenced to an aggregate 34 years' imprisonment. Due to "truth in sentencing," (730 ILCS 5/3-6-3 (West 2008)), defendant was required to serve 85% of his sentence for the assault charges.

¶ 8       On direct appeal, we affirmed defendant's convictions for predatory criminal sexual assault and manufacture of child pornography, but we reversed defendant's convictions for possession of child pornography and aggravated possession of child pornography due to a jury-instruction error affecting the possession offenses. See *People v. Gambaiani*, 2016 IL App (2d) 140124-U. Our disposition did not affect defendant's aggregate sentence because each of the 18 possession offenses received five years each, were concurrent to his sentence for manufacturing child pornography, for which he received a six-year sentence. Subsequently, the Illinois Supreme Court denied defendant leave to appeal. *People v. Gambaiani*, No. 121343 (Mar. 29, 2017).

¶ 9       In December 2017, defendant filed a petition for postconviction relief. In sum, the petition alleged that defendant's initial attorneys—Halvorson and Samuels—instilled in him an expectation that he would receive an offer or a sentence of probation. According to defendant, "[a]t no point" during his consideration of the State's offer did his attorneys explain his maximum sentencing exposure, which caused him to reject the State's offer of a blind plea to a non-probationable Class 1 offense. In his affidavit, defendant stated that attorney Samuels told him when they first met in July 2009, that defendant likely would not serve any prison time. Defendant stated that he rejected the State's original offer in 2009 because, in his own words: "I intuitively believed that if I went to trial and was convicted, I would likely not be given a lengthy sentence since the victim's family did not want me to serve any prison time. And I certainly did not believe

I would receive a sentence longer than 15 years based on the statements made to me by Mr. Samuels." Accordingly, defendant alleged that his attorneys' advice led him to reject the State's offer, specifically because he did not fully understand mandatory consecutive sentencing for sex offenses. See generally 730 ILCS 5/5-8-4(a)(ii) (West 2008).

¶ 10    The petition was advanced to the second stage and the State filed a motion to dismiss. The trial court denied the State's motion, and the petition advanced to a third stage evidentiary hearing (see 725 ILCS 5/122-6 (West 2012)). Attorney Samuels testified that he was hired by defendant's father after defendant was arrested in July 2008. After defendant posted bond, Samuels met with defendant privately to discuss the case. At the time, Samuels only knew that defendant had been arrested on sexual abuse allegations involving his young male cousin, and defendant told Samuels that the whole thing was a big misunderstanding; that he had only wrestled playfully with D.G. and that nothing sexual had occurred. Based upon defendant's information, Samuels told defendant and John that Samuels did believed defendant would likely receive probation and would not have to worry about jail time. Later, when Samuels read through the State's discovery, he learned that the evidence was far more stark than defendant had led him to believe. Samuels then brought in attorney Halvorson to assist with the defense.

¶ 11    In July 2009, Samuels and Halvorson submitted a mitigation proposal to the State urging that defendant be offered a plea to a probationable Class 1 offense, to be served with day-for-day credit. The State rejected the proposal and, on July 16, 2009, informed the attorneys that it would only consider a Class 1 sentence that included prison time. That day, Halvorson and Samuels met with defendant at one of their law offices. John was also in attendance on speaker phone. During the conversation, Samuels did not recall discussing defendant's full sentencing exposure, but he did recall Halvorson saying that if defendant was found guilty of only the charged Class X

offenses, his sentence would be at a minimum of 24 years at 85%–far greater than the *maximum* sentence on the State's offer (15 years at 50%). Samuels stated that defendant rejected the deal because he was determined not to serve any prison time. Samuels told defendant that no jury would acquit him once they saw the cache of child pornography.

¶ 12    Halvorson testified that he explained defendant's sentencing exposure—including minimums, maximums, and possible consecutive sentencing—when they first met. During the July 16, 2009, meeting, to discuss the State's offer, Halvorson recalled explaining to defendant that if he were convicted on any two Class X offenses, his minimum sentence—two six-year terms, served at 85% (or 10.2 years)—would still be more than the maximum 15-year, day-for-day sentence (7.5 years) he would serve on a blind plea to a Class 1 felony. Both attorneys testified that they recommended the offer; however, defendant balked and refused to accept it. Defendant was insistent on probation.

¶ 13    Halvorson testified that defendant was "adamant" that he would not accept an offer that included jail time. John, over the phone, told Halvorson and Samuels to reject the offer but to continue to negotiate with the State. John had stated that, in his experience in the banking and real estate sectors, he believed it was likely the State would make another offer. Halvorson explained to John that this was not like a real estate negotiation and that in his experience, as a prosecutor and a defense attorney, no additional offer would be forthcoming.

¶ 14    In December 2009, Halvorson dictated a memo to the case file regarding the attorneys' July 16, 2009, discussion of the plea offer with defendant. The memo stated in part that defendant was advised to accept the State's offer, and further that, even if he somehow pled guilty to a non-probationable offense "he would likely receive * * * an IDOC sentence * * *." The memo noted that "[defendant] and John Gambaiani were advised that 4-15 at 50% was a good offer in this case

given the nature of the charges and the strength of the State[']s case." The memo further stated that:

> "[Defendant] was also again advised that he was charged with 4 Class X [f]elonies that carry 6-30 years each at 85%. He was advised that they could be served consecutively and that if he were to be found guilty of 2 [C]lass X felonies and if they were to be served consecutively that he would be serving 12 years at 85% which would be greater than the maximum that he could serve on a Class 1 at 50%."

Nevertheless, the memo described defendant's rejection of the offer. Samuels concurred that the memo was an accurate recitation of these events.

¶ 15    Defendant's father, John, testified that he advised defendant against accepting the State's offer because it was "ingrained in [his] mind" that defendant would receive probation. Defendant told his father that he was "not supposed to do any jail time * * *."

¶ 16    Defendant testified that when he first met Samuels, he said defendant would not do any jail time in this case. Defendant believed he was a strong candidate for probation because he had no prior criminal history, and the victim's family (which was also defendant's family) wanted him to receive treatment and not necessarily incarceration. Relevant to the July 2009 plea offer, defendant stated that neither Halvorson nor Samuels ever explained the sentencing ranges or consecutive sentencing to him. He also testified that neither attorney suggested he accept the plea. According to defendant, Halvorson and Samuels told defendant that it was a good offer, but never explained why. Defendant rejected the offer because he "fully expected to receive an offer that involved some form of probation." Defendant stated that he had only learned about consecutive sentencing *after* he was sentenced following his first trial. After his case was remanded, defendant claimed that he would have accepted a 20-year plea offer but would not accept the State's 25-year offer.

¶ 17    After hearing the evidence, the trial court denied defendant's petition. The trial court stated that it found Halvorson and Samuels were credible and had, in fact, explained defendant's sentencing exposure and mandatory consecutive sentencing to defendant. Conversely, the trial court stated that it simply did not find defendant's testimony credible, particularly on the point that defendant said Halvorson and Samuels did not advise him regarding his sentencing exposure:

"You have two extremely experienced lawyers in the criminal field that, frankly, have both spent their whole [careers] in the criminal field and nothing else, who have testified before me credibly that the defendant was only interested in getting probation and was totally unreceptive completely [*sic*] to any disposition that involved the penitentiary.

That is not a hard sell to me. I think that is a common fact when a person is arrested. I don't think it's improper to draw on my twelve years as a prosecutor and my twenty-two years as a criminal defense lawyer while I try to assess what is reasonable and what I believe.

* * *

I mean, when you have a client facing mandatory consecutive [sentences], you have to tell him that this is what is going to happen if you lose. And Halvorson said that.

* * *

What is more believable, unfortunately, and I feel bad for the defendant, frankly, is that because he wanted probation and probably because he was afraid of jail, he rejected an offer that he probably should have taken. And when he didn't take it and went to trial, he ended up getting sentenced [to 43 years].

And then he testified, and I heard him, that even after the case got reversed and it came back the two defense lawyers, the same ones, were still representing him. And that

kind of makes me wonder why you would keep the same lawyers if it's really true that you

were never told [about consecutive sentencing]."

The court then reiterated that it found Halvorson and Samuels credible and that it found defendant

not credible. Defendant timely appealed.

¶ 18                                   II. ANALYSIS

¶ 19    Defendant's primary contention on appeal is that the trial court's ruling was manifestly

erroneous and that his attorneys were ineffective. As this appeal follows from an evidentiary

hearing, we defer to the trial court's factual findings and may reverse only if the judgment is

manifestly erroneous. See *People v. Morgan*, 212 Ill. 2d 148, 155 (2004). We will only find "

'manifest error' " if the trial court's error, and the defendant's right to postconviction relief, "is

clearly evident, plain, and indisputable" from the record. *People v. Ruiz*, 177 Ill. 2d 368, 384-85

(1997).

¶ 20    Criminal defendants are entitled to effective assistance of counsel during plea

negotiations. *Lafler v. Cooper*, 566 U.S. 156, 162 (2012); *Missouri v. Frye*, 566 U.S. 134, 147-48

(2012). This includes the right to effective assistance of counsel when deciding whether to reject

a plea bargain offered by the State. *People v. Curry*, 178 Ill. 2d 509, 518 (1997), abrogated on

other grounds by *People v. Hale*, 2013 IL 113140, ¶ 20. A violation of the right to effective

assistance during plea negotiations is not cured by a subsequent fair trial. *Id*., ¶ 17; *People v.

Williams*, 2016 IL App (4th) 140502, ¶ 33. Claims of ineffective assistance related to the plea-

bargaining process are subject to the two-part test outlined in *Strickland v. Washington*, 466 U.S.

668 (1984). *Hale*, 2013 IL 113140, ¶ 15. This means that a defendant must show that (1) "his

attorney's assistance was objectively unreasonable under prevailing professional norms" and (2)

"there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the

proceeding would have been different.' " *Curry*, 178 Ill. 2d at 519 (quoting *Strickland*, 466 U.S. at 694).

¶ 21    We turn first to the issue of attorney performance, bearing in mind that we may dispose of an ineffective assistance of counsel claim on either performance or prejudice grounds. See *Strickland*, 466 U.S. at 697. For purposes of *Strickland*'s first prong, "a criminal defense attorney has the obligation to inform his or her client about the maximum and minimum sentences that can be imposed for the offenses with which the defendant is charged." *Curry*, 178 Ill. 2d at 528; see also *Williams*, 2016 IL App (4th) 140502, ¶ 33 (a criminal defendant has a "constitutional right to be reasonably informed with respect to the direct consequences of accepting or rejecting a guilty-plea offer from the State").

¶ 22    Defendant points out that in the pre-trial memo Halvorson that dictated, Halvorson stated that defendant "could" receive consecutive sentencing for at least some of his sex offenses. Defendant neglects to consider that the memo was drafted *months* before his first trial commenced, and thus there was the hypothetical possibility that defendant might not be convicted of multiple sex acts, or that it could be argued that multiple sex acts fell under the one act/one crime rule. See, *e.g.*, *Hale*, 2013 IL 113140, ¶ 12. At any rate, we need not parse the memo for hidden meanings. As the trial court noted, based on Halvorson's and Samuels' *testimony*, the court made a *factual* finding that attorneys Halvorson and Samuels *did* inform defendant regarding his sentencing exposure and consecutive sentencing, as well as the favorability of the State's pre-trial offer. Again, the court stated that its determination came from Halvorson's and Samuel's *testimony*, which the court found *credible*. There is simply no basis in the record for overturning the trial court's credibility finding, as all defendant can point to is his own "subjective self-serving testimony" (see *Hale*, 2013 IL 113140, ¶ 18) that his attorneys failed to provide him with such

advice. That is simply insufficient to meet the high burden of demonstrating manifest error. See *Ruiz*, 177 Ill. 2d at 384-85.

¶ 23   Toward the end of his brief, defendant also assails the trial court's findings because the trial court judge referenced his own personal experiences as an attorney handling serious felony cases. Although this issue was not preserved for review, nevertheless, we have carefully examined the record and found that the court's statement was not injudicious and did not exceed the bounds of fair comment. It is axiomatic that "[a] trial judge does not operate in a bubble; she may take into account her own life and experiences in ruling on the evidence." *People v. Thomas*, 377 Ill. App. 3d 950, 963 (2007). As the United States Supreme Court has noted, "[a]ny sentencing decision calls for the exercise of judgment. It is neither possible nor desirable for a person to whom the state entrusts an important judgment to decide in a vacuum, as if he had no experiences." *Barclay v. Florida*, 463 U.S. 939, 950 (1983). In any case, we determine that defendant has failed to meet his burden to prove deficient performance.

¶ 24   We also further find that defendant has failed to prove prejudice. To show prejudice in this type of situation, a defendant must demonstrate a reasonable probability that (1) he would have accepted the earlier plea offer had he received effective assistance; and (2) the plea would have been entered without the prosecution canceling it or the trial court refusing to accept it, if they had the authority to exercise that discretion under state law. *Frye*, 566 U.S. at 147-48 ; *Hale,* 2013 IL 113140, ¶¶ 19-20. This showing of prejudice must encompass more than a defendant's own subjective, self-serving testimony; rather, there must be independent, objective confirmation that defendant's rejection of the proffered plea was based upon counsel's erroneous advice, and not on other considerations. *Hale*, 2013 IL 113140, ¶ 19.

¶ 25   We agree with the trial court that the record shows defendant rejected the State's Class 1

offer because he was *adamant* that he should receive probation and not a penitentiary sentence. Thus, defendant could not have been prejudiced by his attorneys' advice as his decision was *not* based on their advice but on "other considerations." *Id*. Even without consecutive sentencing, defendant faced a possible 30-year sentence if he were convicted of a single Class X offense. Moreover, given the four Class X offenses as well as the numerous additional charges for child pornography and the possibility of discretionary consecutive sentencing, it is not hyperbolic to state that defendant was willing to risk going to prison for *hundreds* of years. In sum, even if we accept defendant's allegations as true, defendant was willing to risk an unsurvivable prison sentence, and reject an offer of only 4 to 15 years, all in the hope of being acquitted or sentenced to probation. We agree with the trial court that defendant's decision was entirely his choice. See, *e.g.*, *People v. Walker*, 2018 IL App (1st) 160509, ¶ 34 (defendant's rejection of plea offer was his own decision, regardless of firearm enhancements, and not based on advice of counsel). Accordingly, defendant was not prejudiced based on his attorneys' advice.

¶ 26     Before concluding, we note that as part of the prejudice analysis, " '[d]efendants must also demonstrate a reasonable probability that the plea would have been entered without the prosecution canceling it or the trial court refusing to accept it, if they had the authority to exercise that discretion under state law.' " (Emphasis omitted.) *Hale*, 2013 IL 113140, ¶ 19 (quoting *Frye*, 566 U.S. at 147). At no time in his postconviction petition or at the evidentiary hearing did defendant address this issue. Thus, while it is arguable defendant's petition could have failed on that basis alone, in any case, it may be said that defendant's postconviction review has received more process than was due.

¶ 27                                    III. CONCLUSION

¶ 28 For the reasons stated, we affirm the trial court's judgment denying defendant's postconviction petition.

¶ 29 Affirmed.